222954. Thank you so much. Is it Stephan or Steven? Or something different? Stephan, Your Honor. Okay, Mr. Stephan, and you've got two minutes, is that correct? That's correct. Thank you, Your Honor, Your Honors. May it please the Court. My name is Keegan Stephan of L. Dr. Bean-Hoffman. I represent Plaintiff Appellant Sheila Linton in this matter. In this case where a police officer permanently injured a nonviolent protester by bending her hand into her forearm when no other exigent circumstances required a swift arrest, the District Court only found that qualified immunity was appropriate because the District Court categorically believed that this Court's decision in Amnesty America did not clearly establish law for qualified immunity purposes. I'm sorry, but can I ask, are you asking us to create a per se rule that if there's permanent damage it is excessive force? No, Your Honor. Okay. So despite the fact that the District Court in this case said that this Court in a published, in its published 2018 decision in Edgerby McGuire said that Amnesty America did clearly establish law for qualified immunity purposes. Is that the opinion written by Judge Katzman? That's correct. That is the decision by Judge Katzman. And not only did that decision say that Amnesty America clearly establishes law for qualified immunity purposes, the Court said that Amnesty America clearly established that twisting a protester's wrist against their forearm, a nonviolent protester's wrist against their forearm in a way that caused permanent injury violated the Fourth Amendment. So that's the same as here because it's a nonviolent protester's? That's correct, Your Honor. How does, um, how does the fact that Linton, uh, uh, didn't stand up like some of the other protesters did and didn't respond in connection with some of the other, uh, in connection with the officer saying, you need to stand up or I'm going to need to do X. Um, how does that factor into this? Well, a few things about that. Um, in the first instance, when the first use of force was applied, she was not yet given the opportunity to stand up that the other protesters were given. Uh, you know, if the light, if the facts are viewed in the light most favorable to the plaintiff, which is second point I would make that the district judge erred in resolving some of the disputed facts in favor of Sergeant Zorn, um, with the light. I'm sorry. So what is, I mean, and so I watched the video and I think the video is, uh, suggest a bunch of things. Um, I'm trying to figure out how all those pieces come together. Um, uh, your position, as I just heard it, was that she was never warned that, uh, painful force was going to be exerted upon her before it was exerted. Is that correct? Certainly not before the first use of pain compliance. Okay. And the, but what do you make of the fact that they were trying to, um, unlink her arms and she didn't unlink? Um, is that, is that a warning? I mean, can we interpret that as a warning? Does it need to be verbal? Uh, even assuming that, uh, I don't believe that that would be a warning. And I would also say that with the facts viewed in the light most favorably to Ms. Linden, she did not resist having her arms unlinked. She testified that she did not resist having her arms unlinked. And even, uh, Trooper Richards and the other arresting officer said that she did not, uh, pull away. Um, you know, And this is a summary judgment. Uh, we're hearing it after, after summary judgment. That is correct, Your Honor. And so with that initial instance, she was not given a warning. Certainly not that plain pain compliance. Okay. So in the first instance, you would say no warning. What about, what happened, or does the analysis change after she was given the warning? Uh, well, I would, um, pause for the second, uh, use of force. Uh, before the second use of force, all that is said is please stand up. Uh, so again, not a, you know, use that further pain compliance would be used. Uh, and then the second, uh, use of pain compliance was initiated, um, an intensification of the rear wrist lock that was already being applied. Uh, so for that second use of force also, no warning. I apologize. Okay. So you're, okay. I'm just trying to remember the nothing being told to her. Second use of force, the, by the third one is when you think she was warned that if she stood up? Correct, Your Honor. Okay. And do you need to show that it wasn't, that it was the first or the second one that caused the injury as opposed to the third, that, um, is there some legal significance in that? Do you need to prove that? I do not believe that that needs to be proved. Uh, there may be legal significance. Obviously, one of the factors is the degree of force used. And one piece of evidence about how extraordinary the use of force was would be the injury. Uh, the injury is often noted in decisions of these nature, including amnesty and edge right. Uh, but even if, uh, you know, there was, uh, you know, the degree of force, um, increased, uh, I believe that under amnesty, all three of those uses of force would be excessive under the circumstances. I mean, the facts are that this was a peaceful group of protesters. They told the, uh, uh, police that they were going to be doing a performative sit-in before this ever happened. Uh, they knew they were going to be arrested. They were going to, you know. Okay. So when they, well, that, that was the next question I had. Um, when they knew they were going to be arrested, does that change her obligation to stand up and comply with the pre-arranged arrest? Um, a couple things about that. I don't think that her obligation is particularly relevant to, uh, the Fourth Amendment question, which is just whether this was an, uh, objectively unreasonable use of force from the eyes of the officer. The officer, you know, what her state of mind was. Well, no, I mean, no, I mean, if the, if they, uh, just, this is a hard issue. And, and, uh, if the officer knew that she knew she was going to And when he came over to arrest her, didn't respond the way that the two prior people had done, which was simply stand up and move. Um, it's that, was that something that would make a reasonable officer think that there's resistance? Again, a couple of things, uh, under these facts, uh, viewed in the light most favorable to her, uh, she was not given that warning, the same warning that the other people were given. Uh, Officer Zorn, uh, approaches and puts her in this pain compliance hold before asking her to stand. The other people were, you know, lifted up by under their, um... No, some of them, well, some of them, some of them actually just stood up and walked, right? And the one, the one, then the two right before her did. Isn't that correct? That's correct. After being asked by the officer, in this case, uh, Ms. Linton testifies that she was not asked to stand, you know, uh, Sergeant Zorn did not kneel down and ask her to stand, uh, which is what happened to other people, uh... Until the third time and subsequent to that multiple times. That's correct. That's correct. And, yeah, so, so once again, there was, there was simply no warning before that first, uh, for the use of the pain compliance. So she did not have the opportunity to stand, uh, and, and leave, uh, you know, under her own power or, uh, with the power of an arrest. Um, I would just also note in my last 30 seconds here that there is an independent ground for, uh, for reversing here. And that is the fact that the district judge construed facts that are material to the qualified immunity analysis against Ms. Linton. Uh, in one instance, the district court even noted that there was a dispute of fact material to the qualified immunity analysis, the degree to which Ms. Linton was resisting and nevertheless granted summary judgment, uh, on qualified immunity, which is quite obviously inappropriate, um, under this court's standards. Well, I'm interested. Can you, can you talk to me like which of the Graham and most, um, support your position? Um, to go point by point, I would rely on my brief, but I think the most important things here are the degree of force used. The degree of force, uh, is the same degree of force that we have in Amnesty America for two of the plaintiffs who survived, uh, that summary judgment motion. So that use of force in a similar context could, you know, is excessive force under clearly established law. Uh, you have the degree of resistance here significantly less than what was going on, uh, in Amnesty America. Uh, and the third is the, the surrounding circumstances. Uh, this is, you know, critical in any, uh, use of force case. Uh, if there is urgency for using force, then perhaps more aggressive force is necessary. But in Amnesty America, you had a protest where they did not inform the police ahead of time. They were blocking an open medical center. Uh, they were chained to each other. They covered themselves in maple syrup. There was a lot more resistance going on. For an officer to have, uh, read Amnesty, which is the, you know, fiction we abide under and qualified immune analysis and say, if I walk into a room where that is going on, where people are blocking a actively open medical facility and resisting this much, I cannot twist their arm behind their back in such a way that it causes permanent injury. If an officer knows that and then walks into a closed state house well and sees people with their arm length singing, they would know no reasonable officer could possibly believe that it would be okay to use the same degree of force that was used in Amnesty. Are you asking us to send this back down for trials? Yes. I believe my time is up. Um, good morning. My name is Neal Kelly. I'm an assistant attorney general in the state of Vermont on behalf of Sergeant Zorn. May it please the court. Can you raise your right? And maybe can you have, can you all help him with that? I'm having a hard time hearing. May it please the court. Okay, please. Um, this case is not the same as Amnesty International. This case should be affirmed for two primary reasons. First and factually, thank you. First and factually, this case is, is, um, there are no material facts to support the defeat of summary judgment. The undisputed video shows what occurred during the course of this episode. It contradicts the plaintiff's arguments along with their deposition. And the unrebutted expert report from on the, from the perspective of a reasonable police officer on the scene shows that there was resistance, there are appropriate control holds, that the compliance techniques were appropriately applied. But didn't his partner, didn't Officer Zorn's partner say that he didn't expect or and was surprised at the use of a pain compliance method here? I don't recall that directly, Your Honor. But what I do know is that, uh, Ms. Linton, um, basically tried to pull away from, uh, Trooper Richardson. And Trooper Richardson was, uh, going along with Sergeant Zorn in the to stand to move. As Your Honor points out, other people had just gotten up and left. There was eight o'clock. There was a, uh, announcement and these demonstrators were sitting with their hands linked. So placed her in a position where the troopers had to get down and get next to her. Well, I thought Richardson testified during his depo that he never attempted to put Linton in a near, in a rear wrist lock because she wasn't pulling away. Well, she was, Your Honor, for the Did he testify? Am I misremembering his testimony? I thought he testified that she, he didn't put her in the, in the rear wrist lock because she wasn't pulling him away. Am I remembering that wrong? I might be. I would say, Your Honor, that the video shows that, um, she was pulling away from Trooper Richardson for almost 20 seconds after Sergeant Zorn tried to put her under, into a wrist lock at, if I may go through the, um, video by time to talk about what is in the video as Trooper Richardson didn't do more than try and hold her arm because Sergeant Zorn was trying to place her under arrest. And so to go into it, Your Honor, and that this episode starts at basically video three, 24, 33 in the video where they come down next to her. Now, meanwhile, she saw him, saw them walk in, saw more than a dozen demonstrators being removed from the well of the state house. Um, and at that point, five seconds elapsed. And at that point, Sergeant Zorn tries to grasp her hand and she pulls away from him. And when she pulls away from him, then he tries to get control of her hand. What I would point to is... Okay, well, I'm, what I'm going to suggest is, do you have your joint appendix? Do you have page 224? I do. Can you pull it up? And this might go to why, um, the video is something that can be, uh, interpreted differently by different people. Um, question, why didn't you put her in the rear, wrist lock, if you can recall? Because I was, I met her resistance with what I thought was reasonable. So whatever resistance she was or was not providing, he didn't think that it required a pain compliant method of meeting it. And that is from Richardson, right? So how you or I or someone else might view the video, um, isn't there at least a question of summary judgment about what a reasonable jury might find? Not necessarily, Your Honor. I just think the answer to that is no. The reason is, it's at the point in time that it doesn't apply. Outside the what? It would depend upon the point in time at which it gets applied. And what I would focus on are the three points that, um, the appellant raises in her brief in chief that she claims that pain compliance applied to her. And the three are, as I was describing, she pulls her hand away from Sergeant Zorn at 2439 to 2432. She claims at 2446 that was the first incident of pain compliance. But at that point in time on the video, 2445 to 47, that's where she almost strikes Sergeant Zorn with her elbow in the nose and is pulling away from him, saying ow, ow, ow. Second, she then says the second incident is at 2447 to 2452. But at that point, again, she is trying to pull away from Sergeant Zorn and comes up at him again with her, with her elbow. He doesn't have her arm under control at that point in time. Those are the first two points of, of alleged pain compliance. And at that point, and after that point, Sergeant Zorn is able to put her arm under control. So whatever Trooper Richardson said or didn't say about what was happening or not, you have to place it in context in terms of the video. So finally, at 2453 to 54, Sergeant Zorn is able to get her arm behind her back. And this is the important point. He's already asked her to please stand up, um, before that second, uh, alleged point of pain compliance. And he's able to get her in a rear wrist lock. And then he asks her, 2456 to 57, please stand up. And she says, I will not stand up. That's in direct contradiction to the argument she's making here on appeal, claiming that she couldn't stand up or that she may have been too hurt to stand up. So that directly contradicts the first two applications of what they claim is pain compliance. And what I would submit is just response to resistance, as Mr. Eastman, the expert, found that report, which is unrebutted. And he actually described moment by moment how that procedures were being employed. But after this point becomes the critical, critical time, after 25 minutes in that video, he asks her for the third time to please stand up. And she provides no response. Now, meanwhile, what she said before, I will not stand up, frames what happens here. Because then he goes on to say, I'm not strong enough to pick you up. Please stand up. And she shakes her head no. She's shaking her head no that she doesn't want to stand up. That's a 2502 to 03. Then she says, he says to her, ma'am, please stand up. She shakes her head a second time as he's asking her to stand up. And then she says, you're hurting me at 2507. This is an important point. This is the point where, as Mr. Eastman says, Sergeant Zorn is in an unenviable position. He's been directed to arrest her. She's not complying with him. And there's no good way to force somebody to comply without some kind of compliance measure being employed. Okay, but wouldn't Amnesty America suggest that bending someone's wrist behind their back when they're being a passive resistor? I mean, even conceding that she's resisting, which he would say, your colleague on the other side would say isn't what was going on. But even if she were a passive resistor, if we can agree to that, wouldn't Amnesty International say the notion of the passivity makes a gratuitous pain compliance problematic? Actually, no. Actually, she's being non-compliant and still resisting at that point in time. And this is where the Crowell case becomes important. Crowell v. Kirkpatrick, on appeal from this Court, recognized that the purpose of using the stun gun, Taser in that instance, with protesters who were chained to a barrel, you know, who were basically not moving, using the stun gun in that situation was reasonable under the circumstances. And what they, the Court recognized in that appeal that the use of that arrest. And what I would submit to you, Your Honor, is just going a little bit further with what happened here. He continued to ask her, would you please stand? She didn't respond. Would you please stand? She did not respond. And then finally, an important point, he crouches down, gets underneath her, and as Mr. Eastman says, he tries to get her in a position where he can lift her using good technique so that he's not trying to hurt her, but rather to just effectuate the arrest. And that's what happened here. Now, you heard reference to the Erte Court decision in this case. This incident from the State House in the state of Vermont occurred in 2015. The amnesty case happened earlier, but the Erte case is from 2018. It doesn't establish the law for purposes of qualified immunity. It may help us understand it. It may, Your Honor, but every case is different. Even in the Erte case, almost towards the end, the Court recognizes that once the facts are established, that the decision that they rendered in terms of the motion to dismiss may change. And that's what we have here. We have a case where the facts and circumstances show that legally, Sergeant Zorn acted reasonably under the circumstances and that he is reasonable in that context. I take it from your argument that you do not, I'm sorry, I take it from your argument that you don't doubt the applicability of amnesty America. Every course, every case rises and falls on its own facts. The facts and amnesty established much more aggressive force than was applied here. The force that was applied here was only for the purpose of placing her under arrest. So you're saying there's a difference in facts here from amnesty? Distinguishable, yes. I was just asking whether amnesty establishes or helps establish. We're all looking at amnesty as establishing the line, and then the question is which side of the line did the behavior fall on? Yes, Your Honor. And the point there is that it's the proportion of the force in relation to the degree of the resistance. And that's what you need to look at. So we've got permanent damage and at most permanent passive resistance, and you're saying that that factors in your favor? It wasn't passive resistance. She was non-compliant and resisting. She was non-compliant and resisting when Sergeant Zorn tried to lift her up. Non-compliant and resisting. She was not standing up. Correct. She wasn't hitting. Nobody's saying that she was. She wasn't screaming obscenities at them. She wasn't. So, I mean, clearly. And you're saying that it wasn't passive. So can you tell me what, when folks are talking about passive resistance, what is that? Your Honor, it's sort of a, it's one of those terms that's a bit of a misnomer. If you look at the proportion of the force being applied to the resistance that's being encountered, that gives you a better range of where it falls on a scale. She was actively resisting. She was non-compliant when she was standing up. Right, but others were non-compliant and they had four people carry them out, as she eventually was. Right, and they didn't have to use a pain compliance method. What would have stopped the officers from doing, in the first instance, what was eventually done, which was to have four people take her, as opposed to trying to get her to stand on her feet on her own and causing permanent damage? Well, Your Honor, this is where police officers get the discretion to determine how they're going to take somebody into arrest. And as Mr. Eastman described, the preferred way is... But they only get what a reasonable officer would do, and his partner, who I'm assuming you would agree was reasonable, said that they didn't think that a wrist rear lock, a pain compliance method, was necessary in connection with the resistance they were experiencing, as did the others who just carried them out by each limb. But, Your Honor, there's several things there. There's two things there at least. The first one is, it's the amount of force that's applied in the moment. I just went through the three points that they're claiming in their brief. That force was reasonable based on the proportion of resistance that was being applied. And secondly, you know, you're talking about Trooper Richardson. It's at the moment that the... I just want to make sure you're not asking us to create a per se rule that if someone refuses to stand up when they are being arrested, that we can inflict no amount, there's no limit to the permanent damage that is going to be affected. Because remember, she never stood up. You're saying pain compliance, compliance with resistance. She was never compliant. She had to be carried out, as did other people. Your Honor... Can you square that away for me? Your Honor, the unrebutted report from the expert described the amount and use of force. Sergeant Zorn, there's no indication that he intended to cause injury here, and there's no indication as to when... There's really no indication? No jury could read the, you should have called your legislator claim that she says is happening, is not an indication? Your Honor, if that was the case, I'm sure that the way that Sergeant Zorn responded would have been different. First of all, that's not in the video, but you've got to take it for what it's worth here. But the bottom line here is the way he took a measured response to her as she's telling him she's not going to get up, she shakes her head no several times, she says she's hurting him, she provides no response to that, he asks her several times, ma'am, would you please stand, and she does not. Let's take the temperature down a bit. I'm trying to solve a problem here. Eventually, they did not get her to stand up, right? You agree, they didn't get her to stand up, she had to be carried up. Well, she got up, she did stand up, and she started walking towards the door. At the very end, right before they went into the elevator and the video. No, Your Honor. At the point that, at point 24, 21 to 24, she gets her up on her feet, and she starts, she stands up at 25, 27, and starts heading towards the door. She tries to pull away from him at that point while she's walking towards the door. And as she's walking towards the door, she starts, she stops her resistance, and it releases the hold on her. When is she being carried by four people? That happens later on when she's on the floor, and then she's complaining, and she's carried out at that point. Okay, so my question is, wouldn't it have also been reasonable for them to have carried her out with four people in the beginning? No, Your Honor. And the reason is, that may have happened in other circumstances, but that's where officers can be injured in the context of how they're placing somebody under arrest. Mr. Eastman talks about that in his expert report. This was an appropriate way to arrest a person who was not only resisting, but noncompliant. And that's what the report in this case shows. Unrebutted. It's unrebutted on summary judgment. There are no facts to stand against his report in this record, along with the video. Thank you. Thank you, Your Honor. Thank you, Your Honor. I'll just address a couple things raised by appellant there. The expert report, you know, you don't need a contrary expert report. This court's cases make that clear. McKinney said that for excessive force claims, it's a jury's unique task to determine the amount of force used, the injuries suffered, and the objective reasonableness of the officer's conduct. I'm sorry, if you're actually expecting us to hear and understand you, you need to slow down and look at us, because I can't do either. I can't hear or understand you. Are you quoting yourself or quoting the case? I'm quoting McKinney there. I'm quoting McKinney, this court's case from last term. McKinney said that for excessive force claims, it's the jury's prerogative to decide the objective reasonableness. If there were only sort of one piece of evidence on objective reasonableness, then, yeah, there would be no issue of fact. But there is one piece of evidence that is an expert report, and then there's a bunch of other evidence. So your position, I guess, is that it's the jury that ought to be reviewing that tape, not us. Exactly. That's the probably most important piece of evidence for a jury to review to determine whether the use of force was objectively reasonable. An expert can't stand in for the jury in reviewing that video. Why didn't you get your own expert? So I wasn't trial counsel in this, but my understanding is it was a tactical decision. They weren't intending to call an expert. That's their view of what would play best before a jury. And I also think that even the expert report in this, even appellant's expert report can be interpreted to see in the video that excessive force was used. The expert says this hold is like a faucet. And then the expert says, here's how extreme I see that faucet on at any juncture. However, if a jury reads or hears that this is like a faucet, they can assume that that can be ramped way up. And who's to say that the use of force at any point is not— What do we make about the fact that the expert said that this was common under the circumstances? I mean, I'm not sure that's particularly relevant. If there's an excessive use of force that is common under the circumstances, chokehold, for instance, that doesn't make it reasonable under all circumstances, let alone this particular circumstance. And once again, I would just say the expert report is simply one piece of evidence on the issue of reasonableness. And it's one that this court has specifically said cannot replace the role of a jury. Just to address a couple more points, if I could, I know my time is up. So the fact that she stood is disputed. She said that she did not stand. She was forced up in the rear wrist lock. The legislature comment is not only testified to by Ms. Linton, but is also testified to by Trooper Richardson. On the same page of his transcript that you quoted from, Your Honor, Trooper Richardson agrees that he heard Sergeant Zorn say that she should have just called her legislature. What? That she should have just called her legislature. And I do agree that that can be interpreted by a reasonable jury that this was just a gratuitous use of force. It's not on page 224. Where is it? Sorry, Your Honor. I can get the exact page number for you. Yeah, I believe the very end of 224. Not on mine. Do you... Oh, I apologize. It's on 228. Question, if I told you that Officer Zorn told her that she could have just called her legislature, what would you think about that? Answer, that's accurate. Wait a minute. Not, did you hear it? Maybe that's why I missed it. If I told you that Officer Zorn told her that she could have just called her legislature... What would you think about that? This is... That it is accurate that she could have called her legislature. So that could be interpreted two ways, right? At least... I only see it as Officer Zorn told her. If I told you that Officer Zorn... Okay, that's cool. I got it, but at least now I know where that piece of information is. Sure. I'd also just clarify there is a dispute of fact on whether will not stand indicated that she was in too much pain to stand. There is a lot going on at that juncture of the video. She is visibly in pain. She says throughout this litigation from her initial pro se complaint through her deposition that the initial wrist lock caused her extraordinary pain. That coupled with what is clear from her face and her words and her actions during the video... I want to focus, because we've kept you over, but I kept him over. So there were two pieces that we were engaging on, and I'd like your reaction to them. One was the suggestion about when compliance or when pain to use to get compliance is appropriate for a passively resistant person. Are you asking for any bright line rules? Are you suggesting to us that it is never appropriate? Is it your view that we need to interpret Amnesty America or Andre to suggest that using a pain compliance method is never appropriate on passive resistors? All that this court would need to find for this case is that it was unreasonable under these circumstances. And the video makes clear that it was unreasonable under these circumstances. Or at least a jury could so find. A reasonable jury could so find. Again, this was a completely peaceful demonstration. The courthouse was closed. The officer could have absolutely just waited for someone else to come. And if the options are waiting for a couple other people to come carry someone out who's not willing to stand, or under the light most favorable to Ms. Linton, just ask her to stand and help her up because she would have walked out, and the officer instead chooses to use a pain compliance technique that this court has said can cause permanent injury, then that is unreasonable. To the point you were asking about, and Appellant was making on compliance, you know, McKinney v. City of Middleton addressed this issue a bit last term, quoting a couple of cases and noting that there is a distinction between failure to facilitate and active resistance. And all that was occurring here at most was a failure to facilitate. And that would be not standing. And so if you have passive resistance and this degree of force, that's objectively unreasonable under circumstances. I would also just reiterate that there wasn't even passive resistance here. She was not given an opportunity to stand. She was forced into a pain compliance technique. I think we've got the argument. Thank you so much. We'll take this case under advisement.